IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JEREMY PALMER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 12-CV-544-PJC |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration,[1] | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Claimant, Jeremy Palmer ("Palmer"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Palmer's applications for disability benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Palmer appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that he was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

Palmer was 33 years old at his initial hearing before the ALJ on August 7, 2008. (R. 36). A second hearing before the ALJ was held on January 5, 2010. (R. 59-79). Palmer did not complete high school and had taken special education courses. (R. 36-37, 65-66).

Palmer's past work experience was in the construction and fast food industries. (R. 66-67). Palmer testified that he was unable to keep a job very long, and that "a lot of it had to do with the employees and managers." (R. 45). Palmer reported that he was unable to get along with his co-workers. *Id*. Palmer had been fired from jobs for tardiness and absenteeism. (R. 45-46). He was fired from his last job after he missed his bus and was late to work. (R. 70-71). He reported that he had been previously warned that he would be fired if he was late again. (R. 71). Palmer said that he had not tried to look for a job because he was unable to function normally. (R. 46-47).

Palmer testified to problems with depression and anger. (R. 39, 45). He said that prior to taking his medications, his mental problems affected "everything " he did. (R. 41, 44). His mental limitations made it difficult for him to deal with things. (R. 41, 44). Palmer's mental problems made it difficult for him to focus, concentrate, and understand. *Id*. He had difficulty following instructions. (R. 41-42, 45). Palmer said that his medications had improved his ability to function, but he still had difficulty concentrating and remembering things. (R. 39-41, 44, 47). He reported that he had to be reminded about everything. (R. 42).

Palmer had a history of drug and alcohol use, as well as incarceration. (R. 34-35, 38-40). Palmer said that he had used alcohol and marijuana when he was 16 years old to self-treat his mental problems. (R. 39-40). He testified that alcohol and drugs had provided him temporary relief of his symptoms. (R. 39). Palmer had served time in jail in 2006 for public intoxication. (R. 38). Palmer reported that his symptoms had improved after he started taking medications in 2006, and when he stopped drinking alcohol in 2009. (R. 40, 42, 73).

Palmer stated he took medication for his mental impairments and for his insomnia. (R. 42-43). At the first hearing, Palmer reported feeling "out of it" for approximately 15 minutes after taking his medications. (R. 43). He had difficulty with drowsiness. (R. 43). On mornings that he overslept, he woke up feeling "kind of clueless." *Id*. On those mornings, he had difficulty accomplishing anything. (R. 41, 43-44). At the second hearing, Palmer testified that he had no side effects from his medication. (R. 72).

With regard to his activities of daily living, Palmer said that he showered, ate, and watched television. (R. 69). He completed household chores, sometimes automatically and sometimes when his mother reminded him. (R. 42, 69-70). Those chores included taking out the trash, doing the laundry, and cooking. (R. 70).

Palmer's medical records include treatment notes from 2001 and 2002 at 12 & 12 Center for Addiction Treatment and Recovery ("12 & 12"). (R. 298-321). Palmer voluntarily admitted himself on November 8, 2001 for residential treatment of alcohol and drug dependency. (R. 298-302). Palmer's admitting Axis I[2] diagnoses were cannabis dependency and alcohol abuse. (R.

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation." Am. Psych. Assn., Diagnostic and Statistical Manual of Mental Disorders 27 (Text Rev. 4th ed. 2000) (hereinafter "DSM IV").

300). His assessed Global Assessment of Functioning ("GAF")[3] was 40. *Id*. On December 6, 2001, Palmer was discharged from the residential program after successfully completing treatment. (R. 309-10).

When Palmer was seen for counseling at 12 & 12 on December 10, 2001, it was noted he had a blunted and flat affect, and he was slow to respond to communication. (R. 315-17). He was diagnosed with major depressive disorder, recurrent, moderate, and it was recommended he receive additional psychiatric assessment. (R. 315). On December 26, 2001, Palmer reported that he was doing well and was not depressed. (R. 318-19). His diagnoses were major depressive disorder and cannabis dependence. (R. 319). Palmer was administratively discharged from the transitional program for non-compliance on January 10, 2002. (R. 312-13).

Palmer started psychiatric treatment at Family & Children Services ("F&CS") on May 12, 2005. (R. 322-34). Palmer reported feeling anxious and depressed, and he expressed a desire to remain sober. (R. 328). He was assessed with major depressive disorder, recurrent, and alcohol dependence. (R. 322, 331). His GAF score was assessed at 62. *Id*.

On October 30, 2005, Palmer was transported to Saint Francis Hospital in Tulsa when he was found walking down the street. (R. 486-503). He complained of shoulder pain and reported that he had been assaulted and thrown out of a moving vehicle. (R. 498). Medical personnel

---

[3] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

noted that Palmer was intoxicated. *Id*. X-rays and CT scans were unremarkable with no abnormalities noted. (R. 491-96). A urinalysis was positive for marijuana, and his blood alcohol level was 225.2 mg/dL. (R. 487, 489, 500). Palmer was discharged with a prescription for pain medication. (R. 500).

At Palmer's appointment at F&CS on March 9, 2006, he stated that he had been off his medications since October 2005. (R. 347). He reported that he had problems with depression, mood swings, irritability, and sleep. *Id.* Palmer was diagnosed with bipolar disorder, most recent episode mixed, moderate; and his prescriptions were refilled. *Id*.

On May 1, 2006, Palmer voluntarily admitted himself to the Crisis Unit at Tulsa Center for Behavioral Health for problems with depression, anxiety, anger, and substance abuse. (R. 427-28). A drug screen was positive for marijuana and opioids. (R. 423, 437). Palmer reported that he bought Xanax and Valium "off the streets" and that they improved his anxiety. (R. 427). Initial diagnoses were bipolar disorder type II and polysubstance dependence. (R. 423, 428). Palmer's GAF score was 38. *Id.* When Palmer was discharged on May 12, 2006, his diagnoses were major depressive disorder, recurrent, moderate, and polysubstance dependence. (R. 424). His GAF was 50. *Id*.

When Palmer was seen at F&CS on June 8, 2006, he reported that he was having a hard time because he had been off his medications for two weeks. (R. 344-45). His medications were adjusted. (R. 344-45).

On November 7, 2006, Palmer presented to F&CS, and an updated treatment plan was completed. (R. 364-75, 388). The treatment plan listed his Axis I diagnoses as bipolar disorder type I, most recent episode mixed, moderate; and alcohol abuse. (R. 364). Palmer's GAF score was 63. (R. 374).

On October 4, 2007, Palmer presented to Kristy Griffith, M.D., at F&CS and reported that he was doing okay, but he was having problems with irritability and anxiety. (R. 442). Dr. Griffith noted that Palmer had an angry and anxious mood and an anxious affect. *Id*. Dr. Griffith assessed Palmer with bipolar I disorder, most recent episode mixed, mild; generalized anxiety disorder; and polysubstance dependence versus alcohol dependence.[4] *Id*. Dr. Griffith adjusted Palmer's medications but denied his request for the medication Klonopin, noting its addictive nature and his history of alcohol dependence. *Id.*

On January 4, 2008, Palmer saw Sarah Janes, D.O., at F&CS. (R. 449-50). Palmer reported that he felt depressed "all the time." (R. 449). Palmer complained of low energy, lack of interest, and feelings of guilt. *Id.* Dr. Janes diagnosed Palmer with bipolar disorder and alcohol dependence, and she adjusted his medications. *Id*.

Palmer presented to F&CS on June 19, 2008, with complaints of persistent problems with depression and anxiety. (R. 443-47). Palmer felt that his new medication had slightly improved his symptoms, and he said that he had not used alcohol in four months. (R. 447). He was diagnosed with bipolar disorder and alcohol abuse, and his medications were adjusted. (R. 443, 447).

Palmer returned to F&CS on December 15, 2008 for an appointment with Sarah Land, D.O. (R. 517-18). Dr. Land noted that it was difficult to obtain Palmer's history, because he was "very tangential." (R. 517). Palmer reported that he had experienced episodes of "manic panic attacks" and described problems with racing thoughts, mood swings, and irritability. *Id*. He

---

[4] Dr. Griffith used numerical codes to express her diagnoses. These codes are from the International Classification of Diseases, 9th edition - Clinical Model coding system, and this is a medically-recognized ranking of diagnoses. *See Little Company of Mary Hosp. v. Shalala*, 24 F.3d 984, 986-87 (7th Cir. 1994); *see also* DSM-IV at 861, 863.

denied current alcohol and drug use, but admitted a history of self-medicating with alcohol and marijuana. *Id.* Dr. Land diagnosed Palmer with bipolar disorder and alcohol abuse, and she adjusted his medications. *Id.*

On January 22, 2009, Palmer had ongoing complaints of anxiety and difficulty sleeping. (R. 515). *Id.* When Palmer saw Dr. Griffith on April 6, 2009, his anxiety and sleep had improved, but he had increased symptoms of depression and low motivation. (R. 514). Dr. Griffith diagnosed bipolar disorder, most recent episode depressed, mild; and alcohol abuse, and she adjusted Palmer's medications. *Id.*

At Palmer's appointment at F&CS on June 12, 2009, he said he had experienced no symptoms of depression, sadness, crying spells, or problems focusing for over a month. (R. 507). He was sleeping and eating well. *Id.* His Axis I diagnoses were bipolar disorder, most recent episode depressed, mild; and alcohol abuse. (R. 512). His GAF score was 65. (R. 513).

On August 2, 2009, emergency medical personnel were called to Palmer's home after he was found unresponsive. (R. 462-85). He was transported to Saint Francis Hospital where he was intubated and placed on a ventilator. (R. 475, 484). Lab tests were positive for marijuana and showed that Palmer's blood alcohol level was 311 mg/dL. (R. 476, 480).

During Palmer's hospitalization, Kirsten M. Wilkins, M.D., conducted a psychiatric consultation on August 4, 2009. (R. 462-67). Palmer denied the use of illicit drugs, but stated that he had monthly episodes of binge drinking. (R. 462-64). Dr. Wilkins's Axis I diagnoses were alcohol abuse; generalized anxiety disorder; and bipolar disorder, per patient history. (R. 464). She assessed Palmer's GAF as 55. *Id.*

When Palmer saw Dr. Griffith at F&CS on August 27, 2009, he told her that he had been hospitalized following a "little accident" in which he drank 30 beers in an 8-hour period. (R.

7

506).  Palmer told Dr. Griffith that he would not drink again because he was "scared to."  *Id.*  Dr. Griffith continued Palmer's medications, but increased his Geodon.  *Id.*  She instructed Palmer to avoid alcohol.  *Id.*

Palmer reported that he was doing fine when he saw Dr. Griffith on October 29, 2009.  (R. 505).  He reported that his mood had improved since his Geodon was increased.  *Id.*  Dr. Griffith decreased the dosage of Palmer's Paxil and continued his other medications.  *Id.*  Dr. Griffith continued her Axis I diagnoses of bipolar disorder, most recent episode depressed, mild; and alcohol abuse.  *Id.*

On September 20, 2006, Palmer was scheduled for a mental status examination as part of his disability claim, but he missed his appointment because he was in jail for a domestic violence charge.  (R. 349-62).

On March 27, 2007, non-examining agency consultant, Joseph K. Kahler, Ph.D., completed a Psychiatric Review Technique Form and Mental Residual Functional Capacity Assessment.  (R. 405-22).  For Listing 12.04, Dr. Kahler indicated that Palmer had affective disorders, noting a mood disorder, not otherwise specified.  (R. 408).  For Listing 12.09, Dr. Kahler indicated that Palmer had substance addiction disorders.  (R. 413).  For the "Paragraph B Criteria,"[5] Dr. Kahler said that Palmer had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining

---

[5] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment.  The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

concentration, persistence, or pace, with one or two episodes of decompensation. (R. 415). In the "Consultant's Notes" portion of the form, Dr. Kahler noted Palmer's participation in 12&12's recovery program and his mental health treatment. (R. 417).

In Dr. Kahler 's Mental Residual Functional Capacity Assessment, he indicated that Palmer had moderate limitations in four areas: his ability to maintain attention and concentration for extended periods; his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and his ability to accept instructions and respond appropriately to criticism from supervisors. (R. 419-20). In narrative comments, Dr. Kahler wrote that Palmer appeared to have:

> symptoms of irritability and depressed mood that may moderately limit his ability to concentrate for long periods, which in turn may affect his ability to perform activities within a schedule to some extent. His pace may fluctuate with situational exacerbations of mood distress. He may be quite sensitive to harsh supervisory criticism because of a baseline dysphoria, however he should respond well to gentle correction and he would be able to accept instruction without problems. [Palmer] appears to retain the capacity for low stress work. With continued [mental health] treatment and abstinence from substances of abuse, functional limitations would be expected to further abate.

(R. 421).

Agency examining consultant Jerry Vaught, Ph.D., completed a mental status examination of Palmer on September 22, 2009. (R. 456-61). When Dr. Vaught showed Palmer his medical records, Palmer admitted that he had a history of binge drinking. (R. 457). Palmer reported that he bathed, watched television, cooked, cleaned, did the laundry, and shopped. *Id.* He reported that his memory and concentration were "pretty good", and that his energy was okay. *Id.*

9

During Dr. Vaught's examination, Palmer was able to repeat five digits forward, but inconsistently repeated four digits backwards. (R. 457). Dr. Vaught noted that Palmer's responses were somewhat inconsistent and that they suggested he had possible problems with his attention and concentration. (R. 458). IQ test scores placed Palmer in the borderline range of intellectual functioning. (R. 457-58). Dr. Vaught found that Palmer's auditory memory and immediate memory were extremely low and his visual memory was average. (R. 458-59). On Axis I, Dr. Vaught diagnosed mood disorder, not otherwise specified; and alcohol abuse in remission by report. (R. 460). On Axis II, he diagnosed borderline intellectual functioning. (R. 461).

Dr. Vaught completed a Medical Source Statement and found that Palmer was mildly limited in his ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions. (R. 453). He found that Palmer was moderately limited in his ability to make judgments on complex work-related decisions, to interact appropriately with supervisors and co-workers, and to respond appropriately to usual work situations and to changes in a routine work setting. (R. 453-54). He assessed that Palmer was markedly limited in his ability to understand and remember complex instructions, to carry out complex instructions, and to interact appropriately with the public. *Id.*

## Procedural History

In July 2006, Palmer filed applications for disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*. (R. 172-78). Palmer alleged onset of disability as of April 28, 2005. (R. 175). Palmer's applications were denied initially and on reconsideration. (R. 100-03, 105-10). An administrative hearing was held before ALJ Richard J. Kallsnick on August 7, 2008. (R. 31-58, 111-12). By decision dated September

4, 2008, the ALJ found that Palmer was not disabled. (R. 85-95). On June 3, 2009, the Appeals Council issued an Order remanding the case back to the ALJ for further administrative proceedings. (R. 96-99). Following a second administrative hearing before ALJ Kallsnick on January 5, 2010, Palmer was again found not disabled by decision dated February 10, 2010. (R. 20-30, 59-79). On August 10, 2012, the Appeals Council denied review of the February 10, 2010 decision. (R. 1-4). Thus, the February 10, 2010 decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard Of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[6]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[6] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience,

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Palmer met insured status requirements through December 31, 2005. (R. 23). At Step One, the ALJ found that Palmer had not engaged in any substantial gainful activity since his alleged onset date of April 28, 2005. *Id.* At Step Two, the ALJ found that Palmer had severe impairments of mood disorder, borderline intellectual functioning, and history of drug and alcohol abuse. *Id.* At Step Three, the ALJ found that Palmer's impairments did not meet any Listing. *Id.*

---

and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

The ALJ determined that Palmer had the RFC to perform medium work with the following nonexertional limitations:

> [Palmer] must perform simple unskilled work in a low stress type environment with routine supervision, and he would be able to adapt to a work situation. He is afflicted with symptomatology from a variety of sources that would be of sufficient severity as to be noticeable to him but nonetheless he would remain attentive and responsive in a work setting and could carry out his duties satisfactorily within these limitations.

(R. 24). At Step Four, the ALJ found that Palmer could not perform any past relevant work. (R. 28). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Palmer could perform, considering his age, education, work experience, and RFC. *Id.* Thus, the ALJ found that Palmer was not disabled from April 28, 2005 through the date of the decision. (R. 29).

## Review

Palmer frames his first argument as the ALJ's failure to comply with the remand order of the Appeals Council; however, his true argument is that the ALJ failed to properly evaluate the opinion evidence of agency examining consultant Dr. Vaught. Plaintiff's Opening Brief, Dkt. #14, pp. 4-5. Palmer also asserts that the ALJ's credibility assessment was inadequate, and he further requests an immediate award of benefits due to the length of time that his July 2006 applications have been pending. Because the Court agrees with Palmer that the ALJ did not sufficiently explain how he incorporated or rejected Dr. Vaught's opinion evidence, the Court **REVERSES AND REMANDS** for further proceedings.

**Opinion Evidence of Agency Examining Consultant Dr. Vaught**

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). The regulations of the Social Security Administration require that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 416.927(d); *see also* SSR 96-5p, 1996 WL 374183. An ALJ must consider the opinion evidence and, if he rejects it, he must provide specific legitimate reasons for the rejection. *Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir. 2003); *Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005) (unpublished). If an ALJ's RFC determination conflicts with a medical opinion, then the ALJ must explain why the opinion was not adopted. *Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished), *citing* SSR 96-8p, 1996 WL 374184; *Ramirez v. Astrue*, 255 Fed. Appx. 327, 332-33 (10th Cir. 2007) (unpublished) (directing ALJ on remand to make specific findings explaining why he did not adopt opinions of consulting examiner).

The Court agrees with Palmer that the ALJ erred by failing to explain how his RFC determination incorporated or rejected the limitations found by examining consultant Dr. Vaught. *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007). The claimant in *Haga* had numerous physical and mental impairments, and the ALJ had included nonexertional restrictions in his RFC determination, limiting the claimant to "simple repetitive tasks" with "only incidental contact with the public," and "no requirement for making change." *Id.* at 1207. A consultant had completed an RFC form indicating that the claimant was moderately impaired in seven functional categories. *Id.* The claimant argued that the ALJ had implicitly rejected the consultant's opinion by failing to include any accommodations in his RFC determination that addressed the consultant's assessment

14

that the claimant had moderate difficulty in her ability to deal appropriately with supervisors and coworkers and to respond appropriately to workplace pressures and changes. The ALJ had given no explanation relating to why he did not address some of the consultant's findings of moderate restrictions while including others, and the Tenth Circuit agreed that this omission required reversal so that the ALJ could explain the evidentiary support for his RFC determination. *Id.* at 1207-08.

Here, the ALJ accurately summarized Dr. Vaught's report and his findings that constitute opinion evidence. (R. 27). The ALJ later stated that he gave "[g]reater weight" to Dr. Vaught's opinions, when compared to Dr. Kahler's opinions, because Dr. Kahler was a nonexamining consultant. *Id.* He also said that Dr. Vaught's opinions were "consistent with the bulk of the medical evidence." *Id.* These statements give the impression that the ALJ relied upon Dr. Vaught's report in formulating his RFC, although the ALJ did not state this directly.

The difficulty is that it is not clear to this reviewer how the ALJ incorporated the opinion evidence of Dr. Vaught into his RFC determination. His RFC said that Palmer was restricted to (1) simple, unskilled work; (2) in a low-stress environment; and (3) with routine supervision. (R. 24). He then included the affirmative statement that Palmer could adapt to a work situation. *Id.* The ALJ's RFC restriction to simple work appears to incorporate Dr. Vaught's findings of mild limitations on Palmer's ability to understand, remember, and carry out simple instructions and to make judgments on simple work-related decisions. (R. 453). It is not clear, however, how the ALJ's RFC determination addresses Dr. Vaught's opinion that Palmer was moderately restricted in his ability to interact appropriately with supervisors and co-workers and in his ability to respond appropriately to usual work situations and changes in a routine work setting. (R. 24, 453-54). Perhaps the ALJ's judgment was that a "low-stress environment" would address these

aspects of Dr. Vaught's opinions, but that analysis is not clear to this reviewer.[7] In addition to explaining how he addressed the opinions of Dr. Vaught, the ALJ needs to explain the evidentiary basis for his affirmative statement that Palmer could adapt to a work situation.

As the Tenth Circuit made clear in *Haga*, the ALJ cannot adopt most of Dr. Vaught's limitations and reject some without explanation. The case must be reversed in order to allow the ALJ to explain what portions of the opinions of Dr. Vaught he adopted and what portions he rejected. The explanation needs to make the ALJ's analysis clear to reviewers. *Krauser v. Astrue*, 638 F.3d 1324, 1330-31 (10th Cir. 2011) (reviewing court was required to remand because it could not meaningfully review the ALJ's determination); *Langley v. Barnhart*, 373 F.3d 1116, 1123 (10th Cir. 2004) (ALJ's reasons for rejecting treating physician opinion must be sufficiently specific to allow meaningful review).

**Other Issues Raised by Palmer**

Because the Court finds that reversal is required based on the ALJ's failure to explain why he did not incorporate all aspects of Dr. Vaught's opinion evidence into his RFC, the Court does not take a position on two other issues raised by Palmer: the ALJ's failure to explain why he did not incorporate the evidence given by nonexamining consultant Dr. Kahler and the ALJ's

---

[7] The ALJ did not include a provision in his RFC determination addressing Palmer's marked inability to interact appropriately with the public, but this appears to be a "scrivener's error." *See Poppa v. Astrue*, 569 F.3d 1167, 1172 n.5 (10th Cir. 2009) (ALJ's incorrect statement of date of surgery was scrivener's error that did not affect the outcome of the case). Here, the ALJ at Step Four ruled that Palmer could not return to past relevant work apparently on the basis that it required "more than minimal contact with the public." (R. 28). Thus, it appears that the ALJ intended to include a limitation to "no more than minimal contact with the public" in his RFC determination. Because the undersigned is reversing due to the failure of the ALJ to explain the other aspects of Dr. Vaught's opinion that he did not incorporate into his RFC, it is unnecessary to rule on his omission of language regarding contact with the public. The ALJ should address Palmer's capacity for contact with the public on remand.

16

credibility assessment. The Court notes, however, that the ALJ's only mention of Dr. Kahler's report was in stating that he gave it "some weight." (R. 27). On remand, the ALJ should discuss Dr. Kahler's report and provide more explanation regarding his reasons for the weight he determines it should be given. Further, as discussed relating to the opinion evidence of Dr. Vaught, the ALJ must explain if he is adopting or rejecting the evidence of Dr. Kahler, and his analysis must be sufficiently specific to allow for meaningful review.

The Court also declines to rule on the sufficiency of the ALJ's credibility assessment. The Court notes, however, that the ALJ's discussion does not appear to link his factual recitation to any specific reasons for finding that Palmer was less than completely credible. For example, simply summarizing Palmer's testimony regarding his activities of daily living was not sufficient to explain why those activities made him less than fully credible. (R. 25-26). Affirmative linking of specific reasons with substantial evidence is one of the requirements of a credibility assessment. *See Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1172 (10th Cir. 2012), *citing Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005). On remand, the ALJ should ensure that his credibility assessment links specific reasons with substantial evidence.

**No Award of Immediate Benefits**

Whether to remand for an immediate award of benefits is a matter of discretion for the Court. *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006). The court in *Salazar* said that a court should consider the length of time that the matter has been pending and whether additional fact-finding would serve a useful purpose or would merely delay the receipt of benefits. *Id.* Here, the undersigned agrees with Palmer that the seven-year period during which his 2006 applications for disability benefits have been pending is too long. The undersigned finds, however, that this is not a case where additional fact-finding would be futile. Instead, this is a case that needs

appropriate analysis of the facts so that a legitimate conclusion can be made regarding whether Palmer is disabled.

In his argument Palmer made an allusion to the capacity of this ALJ to fairly decide his claim. Plaintiff's Opening Brief, Dkt. #14, p. 10. In *Qualls v. Astrue*, 428 Fed. Appx. 841, 849 (10th Cir. 2011) (unpublished), the Tenth Circuit addressed the claimant's argument that the ALJ had demonstrated bias by two comments he made at the beginning of the administrative hearing. The court noted that the ALJ enjoyed a presumption of honesty and integrity. *Id.* The court agreed with the Commissioner's characterization of these as "stray" comments that did not show bias when viewed in the context of the entire hearing. *Id. See also Shivel v. Astrue*, 260 Fed. Appx. 88, 92-93 (10th Cir. 2008) (unpublished) (isolated evidentiary ruling that was "troubling" was not substantial evidence of bias). The Tenth Circuit has stated that the court will direct reassignment[8] of a case to another ALJ only "in the most unusual and exceptional circumstances." *Miranda v. Barnhart*, 205 Fed. Appx. 638, 644 (10th Cir. 2005) (unpublished). Palmer has not requested that this Court order that the Commissioner assign a new ALJ to his case on remand, and therefore this Court need not directly address this issue. The Court notes, however, that the Social Security Administration has provided a procedure for claimants to object to an ALJ and thereby implicitly to request reassignment to a new ALJ. *See* 20 C.F.R. § 404.940.

---

[8] Apparently there is some conflict among federal district courts and courts of appeal regarding the power of a court to order or to direct that a case be assigned to a new ALJ on remand. A court in the Eastern District of New York attempted to collect some of the conflicting cases in *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 291-92 (E.D.N.Y. 2004). *Sutherland* has been cited by several district courts within the Tenth Circuit. *See, e.g., Brown v. Astrue*, 2011 WL 5356806 at *1 (D. Kan.); *Chamblin v. Astrue*, 2010 WL 3843031 at *3 (D. Colo.).

**Conclusion**

This Court takes no position on the merits of Palmer's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 28th day of October 2013.

_____
Paul J. Cleary
United States Magistrate Judge